OPINION
NIEMEYER, Circuit Judge:
Following searches of two residences associated with Covonti Kwa Moses in Greensboro, North Carolina, police officers recovered illegal drugs and firearms. Moses pleaded guilty to possession with intent to distribute more than five grams of crack cocaine and to being a felon in possession of a firearm and was sentenced to 262 months’ imprisonment. With the agreement of the court, Moses reserved the right to appeal the district court’s denial of his motion to suppress, challenging the searches as unconstitutional.
Moses contends on appeal that the police officers’ warrantless entry into the two residences was unsupported by probable cause and exigent circumstances, as claimed by the officers, and therefore violated his Fourth Amendment right to be free from unreasonable searches. Finding his arguments unpersuasive in the particular circumstances of this case, we affirm.
I
In May 2006, the Tactical Special Enforcement Team of the Greensboro, North Carolina police department commenced an investigation of a local street gang known as the “Goodfellas,” which was suspected of involvement in drug trafficking, several shootings, and other related violent crimes. A month later, the officers apprehended the leader of the gang, Carl Kotay Graham, who provided the officers with substantial information about the gang’s activities and named Moses among its members.
Graham told officers that Moses, who was already well known to the officers from previous encounters, served as “an enforcer-type person for the group ... who carried guns” and who “stash[ed] cocaine and firearms” at a residence on Cedar Street in Greensboro, “a cream-colored duplex.” Graham also told the officers that Moses drove a “green Lincoln with temporary tags.” Finally, he said that Moses had firearms and a ballistic vest in the house, as well as cocaine that he stashed for both Graham and another member of the Goodfellas gang.
When a Greensboro police officer thereafter observed a green Lincoln with temporary tags in front of 407 North Cedar Street, he alerted Officer Eric Goodykoontz, who visited the location and confirmed the fact. At Officer Goodykoontz’s *266 initiative, officers set up a “perimeter” in the area with the purpose of apprehending Moses.
While the perimeter was in place, Officer Goodykoontz observed Moses, whom he recognized from previous encounters, and a female emerge from unit A of 407 North Cedar Street. Moses was carrying what appeared to be shoe boxes, which he placed in the trunk of the Lincoln, and then the two returned to the house. Officer Goodykoontz could not, however, tell whether they entered unit A or unit B of 407 North Cedar Street. When Officer Goodykoontz ran a computer check on Moses, he discovered that Moses’ driver’s license was suspended. Shortly thereafter, Moses and his female companion returned to the Lincoln and drove away. Goodykoontz notified the other officers in the perimeter that Moses had left the premises and was driving on a suspended license.
Officers stopped Moses approximately one block from the Cedar Street residence. As Sergeant Tom Kroh approached the scene, he saw “Mr. Moses outside of the car, and he look[ed] like he [was] dialing his phone. He [was] doing something with his phone----” Sergeant Kroh asked Moses whom he was calling, and Moses replied that he was talking to his cousin, who lived in unit B of 407 North Cedar Street. When Moses explained that he had just left his cousin’s house at 407-B' North Cedar Street, Sergeant Kroh became concerned that Moses had alerted someone back at his Cedar Street residence about the traffic stop, and he ordered Moses to hang up the phone. The officers placed Moses under arrest for driving on a suspended license and found four grams of marijuana on his person. Sergeant Kroh advised Officer Goodykoontz, who had remained at the Cedar Street location, that he believed Moses may have alerted someone at the residence that the police had stopped him. Kroh then returned, with Moses in custody, to the Cedar Street residence.
Officer Goodykoontz knocked on the door of unit A, from which he had seen Moses emerge with the shoe boxes, but no one came to the door. The windows were blocked so that he could not see inside. At the same time, Sergeant Kroh and another officer knocked on the door of unit B, which was attached to unit A, and Catressa Moore came to the door. Moore admitted to the officers that Moses was her cousin, but she denied that he had just been visiting her, saying that he lived in unit A. Moore “further stated that she hated [Moses] and had nothing to do with him.” Moore then began yelling and screaming at the officers, without provocation, creating such a loud commotion that Officer Goodykoontz heard it on the other side of the house while investigating unit A. Moore eventually gave consent to the officers to search her unit B to determine whether there was an interior access between the two units. The officers discovered none.
Officer Goodykoontz confronted Moses, who was inside a police vehicle in front of the Cedar Street residence, about his connection to unit A. Moses insisted that he had nothing to do with unit A and had been visiting his cousin in unit B. Because Goodykoontz had personally observed Moses come out of unit A, he and Sergeant Kroh decided to try Moses’ keys to determine whether a key provided access to unit A. When a key fit the lock on unit A, the officers “felt like [they] had enough for a search warrant on the residence.” Sergeant Kroh and Officer Goodykoontz, however, were concerned that someone might be inside of unit A in the process of destroying evidence and also presenting a threat to the safety of the officers as they waited outside the house for a search war *267 rant. Their concern arose from Moses’ behavior in making the phone call during the traffic stop, his cousin’s behavior in creating a loud commotion, the presence of a gold-colored vehicle parked in front of the house, the officers’ inability to see inside unit A, and Moses’ false denial of association with that unit. Sergeant Kroh, Officer Goodykoontz, and two other officers therefore decided to enter unit A to secure the premises and any evidence therein while they obtained a search warrant.
During a protective sweep, the officers found no one inside unit A, but they observed, in plain view, residue that they field tested and identified as crack cocaine, as well as a marijuana cigarette butt and some photos of Moses on the dresser in the bedroom. They exited approximately three minutes after entering, leaving officers on the front porch to keep the unit secure.
Based on the total information that the officers had, including the statements given them by Graham, the officers obtained a search warrant and conducted a search of unit A, where they recovered, among other things, a .44 magnum revolver.
While at the scene at 407 North Cedar Street, Officer Goodykoontz received a call from another officer who had been interrogating Graham. Graham had said that “Moses was selling crack cocaine out of a residence on Pearson Street.” Connecting that information with an anonymous CrimeStoppers tip earlier in the week, which complained of a black male subject driving a green Lincoln and selling crack cocaine at 1309 South Pearson Street, as well as the officers’ subsequent observation of a green Lincoln at the same address, Sergeant Kroh and several officers took Moses’ keys to 1309 South Pearson Street and found that one of them opened the door. Again concerned that “if anybody was inside ... they would be aware of [the officers’] presence,” Sergeant Kroh authorized entry into the house. In a search that lasted less than a minute, the officers confirmed that no one was present in the home and observed in plain view digital scales and crack cocaine residue.
Based on the information obtained from 1309 South Pearson Street, as well as the information learned earlier, the officers also obtained a search warrant for 1309 South Pearson Street. Following a search of the residence, the officers recovered approximately 14 grams of crack cocaine.
Based on the crack cocaine found at the Pearson Street residence and the firearm found at the Cedar Street residence, Moses was indicted for possession with intent to distribute more than five grams of crack cocaine, in violation of 21 U.S.C. § 841(a) and § 841(b)(1)(B), and for possession of a firearm while being a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment specified that Moses had previously been convicted of felony drug crimes in North Carolina courts in 2001 and 2002.
In a motion to suppress the evidence recovered during the searches of the two residences, Moses contended that the searches violated his constitutional rights because they were warrantless entries into houses where no exigent circumstances existed to justify an entry without a warrant. The district court denied Moses’ motion. With respect to the Cedar Street residence, the court found that a reasonable officer could have believed that exigent circumstances existed, justifying the warrantless entry. But the court concluded that no such reasonable belief could be held with respect to the Pearson Street residence and therefore that the warrant-less entry of that house was unlawful. The court concluded nonetheless that the search warrant application for the Pearson *268 Street residence contained sufficient independent evidence, untainted by the unlawful entry, to support the magistrate judge’s finding of probable cause and the issuance of the warrant.
Moses then pleaded guilty, conditioned on his right to appeal the denial of his motion to suppress. See Fed.R.Crim.P. 11(a)(2).
On appeal, Moses contends: (1) that probable cause to enter 407-A North Cedar Street was lacking; (2) that no exigency existed to justify entry into 407-A North Cedar Street without a warrant; and (3) that the warrant application for 1309 South Pearson Street, when stripped of evidence tainted by the unlawful warrantless entry therein, did not contain enough information to support a finding of probable cause.
We address each argument in turn, construing the facts in the light most favorable to the government as the prevailing party below, see United States v. Kimbrough, 477 F.3d 144, 147 (4th Cir.2007), and reviewing the district court’s factual findings for clear error and its legal conclusions de novo, see id.

II

Moses contends that the Greensboro police officers lacked probable cause to believe that when they entered the residence at 407-A North Cedar Street, they would find contraband or evidence of a crime. He argues that “[t]he information that comprised the lion’s share of the ‘totality of the circumstances’ concerning the existence of drugs inside Apartment 407A N. Cedar St. prior to the officers’ warrant-less entry consisted almost exclusively of information provided to police by Carl Kotay Graham on June 22, 2006.” That information, in Moses’ view, did not establish “a fair probability that contraband or evidence of a crime [would] be found” in the Cedar Street residence. Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Specifically, Moses points to an informal intelligence summary maintained by the Tactical Special Enforcement Team investigating the Goodfellas gang, which documented the interview with Graham but failed to indicate that Graham told the officers about drugs at the Cedar Street residence. The relevant entry in the summary reads as follows:
[Graham] said that Covanti [Moses] is the man with the guns. He said that he lives on Cedar St. in a cream colored house which is 2 houses past Bellemeade (on the right) if driving north on Cedar. He drives a gray Intrepid and a green Lincoln. He has seen a .357 magnum, an SKS, and a ballistic vest there in the past two weeks.... He does not sell out of his house and lives there by himself. ... Jerome Monk is supplying Moses with his cocaine.
Moses argues that because the summary says nothing to indicate that Moses stashed drugs at the Cedar Street residence, the district court erred in crediting Officer Goodykoontz and Sergeant Kroh, both of whom testified that Graham said Moses stored drugs at the Cedar Street residence.
Moses’ argument challenges factual findings made by the district court, and we can disturb such findings only if they are clearly erroneous. While the district court acknowledged that it was “certainly a fair question as to why [Moses’ stashing drugs] would not have been written down” in the intelligence summary, the court credited the officers’ testimony and found as a fact that Graham “informed the police that Moses stashed money, drugs, and guns in a cream-colored duplex located on North Cedar Street.”' We owe particular deference to the district court’s credibility findings, *269 as the court is in a much better position to evaluate those matters. See United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir.2008); see also Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Certainly, we cannot say that the district court’s decision was clearly erroneous when there was substantial evidence to support its conclusion.
Thus, the question is whether the evidence, which included the officers’ testimony about what Graham said, supported a finding of probable cause.
The determination of whether probable cause exists depends on the totality of the circumstances and involves a “practical, common-sense decision whether ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.” Gates, 462 U.S. at 238, 103 S.Ct. 2317. Because “probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules,” id. at 232, 103 S.Ct. 2317, we “give due weight to inferences drawn from [the] facts by ... local law enforcement officers,” Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); see also United States v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir.2004) (“Under this pragmatic, common sense approach, we defer to the expertise and experience of law enforcement officers at the scene”).
The total circumstances informing the officers’ decision in this case about whether contraband or evidence of a crime would be found in the 407-A Cedar Street residence included, in addition to Graham’s statement that Moses kept guns and drugs at the residence, a wealth of background and contextual information corroborating Graham’s statement. Graham described a cream-colored duplex on Cedar Street in which Moses lived and stashed drugs and guns, and Officer Goodykoontz observed Moses, whom he knew from earlier incidents, emerging from unit A — a cream-colored duplex on Cedar Street. Graham advised the officers that Moses drove a green Lincoln with temporary tags, and Officer Goodykoontz observed Moses enter a green Lincoln with temporary tags and drive away. When Moses was arrested, he had a quantity of illegal drugs on his person. Moreover, after he was stopped and was found to have drugs on his person, he deflected the officers’ attention from unit A, telling the officers that he had no connection to the unit. Yet Officer Goodykoontz knew that this statement was false as he had observed Moses exit from unit A. The officers also held suspicions relating to Moses’ telephone call to his cousin after Moses was stopped and the commotion created by his cousin when spoken to by officers at unit B. Finally, keys taken from Moses fit the front door of unit A, despite Moses’ protestation that he had nothing to do with the unit.
From all of this evidence, the officers concluded, in a common sense approach, that unit A probably contained contraband or evidence of a crime. And this is precisely the type of circumstance in which we defer to the officers’ expertise and experience. See Ornelas, 517 U.S. at 699-700, 116 S.Ct. 1657; Dickey-Bey, 393 F.3d at 453. Accordingly, we conclude that when the officers entered unit 407-A Cedar Street, they had probable cause to believe that contraband would be found inside.
Ill
Finding probable cause, however, fulfills only one half of the Fourth Amendment requirements in the circumstances of this case. “It is well established that, even when officers have probable cause to believe that contraband is present in a home, *270 a warrantless search of the home is unlawful unless exigent circumstances exist at the time of entry.” United States v. Mowatt, 513 F.3d 395, 399 (4th Cir.2008) (citing Payton v. New York, 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). Examples of exigent circumstances include a “risk of danger to the police or to other persons inside or outside the dwelling,” Minnesota v. Olson, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (internal quotation marks omitted), and situations “where police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant,” United States v. Cephas, 254 F.3d 488, 494-95 (4th Cir.2001). The police are not required to “produce concrete proof’ that evidence was on the verge of being destroyed; “rather, the proper inquiry focuses on what an objective officer could reasonably believe.” United States v. Grissett, 925 F.2d 776, 778 (4th Cir.1991).
In United States v. Turner, 650 F.2d 526 (4th Cir.1981), we articulated a nonexhaustive list of factors to consider in determining whether exigent circumstances are present:
(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers’ reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.
Id. at 528.
In this case, the district court found that exigent circumstances existed to justify the warrantless entry into 407-A North Cedar Street, relying on the following:
The proximity of the traffic stop to the North Cedar Street residence, Moses’s cellular telephone call to his cousin in the adjacent apartment, and the extended commotion caused during the consensual search of apartment 407-B provided a reasonable basis for police officers to believe that anyone remaining in apartment 407-A was aware of the police action. Further, based on the information learned through Graham that Moses utilized the North Cedar Street residence as a stash house for money, drugs, and guns, it was reasonable for officers both to fear for their safety and to suspect the imminent destruction of evidence.
We review these findings for clear error. See Mowatt, 513 F.3d at 399; Turner, 650 F.2d at 528.
Moses argues that, given the evidence known to the officers before they created the perimeter in order to apprehend Moses, no objective officer could reasonably have believed that exigent circumstances existed. He points particularly to the fact that police had no evidence from Graham, their own observations of the Cedar Street location, or any other source that suggested another person besides Moses lived at the 407-A North Cedar Street residence or was present there on the day of the search. In fact, according to the informal intelligence summary maintained by the police, Graham specifically stated that Moses lived alone. Thus, Moses argues, in effect, that officers should not be permitted to adjust their beliefs to accommodate subsequently developed suspicions.
Moses, however, has no legal or logical basis to assert that officers must be governed by initial information and not be informed by later developments during the course of their investigations. Indeed, to deny officers the ability to react to infor *271 mation as it unfolds would directly contradict the instruction of Ornelas and Dickey-Bey to give deference to the experience and expertise of officers in drawing inferences from facts uncovered during investigations in the field.
It is true that the officers initially had no evidence suggesting that another person was present in 407-A North Cedar Street. When, however, Moses made a telephone call during the course of the traffic stop to his cousin at 407-B North Cedar Street — the residence adjacent to unit 407-A from which Moses was seen to have emerged — Sergeant Kroh became concerned that Moses had warned someone back at Cedar Street about the police so that evidence at 407-A could be removed or destroyed. Moreover, when the officers reacted to this suspicion and returned to 407-B North Cedar Street to interrogate the cousin, her behavior in causing a loud and unprovoked commotion added to the officers’ suspicions that someone else was present inside unit A and that her outburst was calculated as a warning to that person. See United States v. Vasquez, 638 F.2d 507, 531-32 (2d Cir.1980) (upholding an exigent-circumstances search of a fourth-floor apartment where suspects deceived officers into investigating a second-floor apartment whose occupants created a loud commotion that officers reasonably believed might have warned persons on the fourth floor to the police’s presence). The officers also observed that the windows of unit A were blocked and that a gold vehicle was parked outside the house, suggesting the possibility that someone else might be present. Moses’ argument simply ignores these highly relevant facts.
The district court considered all of these facts and made a finding that exigent circumstances existed to justify the immediate entry into unit 407-A. We cannot conclude that the district court’s factual findings were clearly erroneous in light of the circumstances.
IV
Finally, Moses contends that the search warrant issued for 1309 South Pearson Street was not supported by probable cause after evidence obtained during the illegal entry of that residence is eliminated from the application for the warrant. The district court found that the officers did not have exigent circumstances to enter the Pearson Street residence, and the government has not appealed that decision. Accordingly, evidence obtained during entry of the residence may not be considered to support the search warrant subsequently obtained, and we must determine whether, when that evidence is excluded from the application for the warrant, probable cause to support the warrant still existed. See United States v. Karo, 468 U.S. 705, 719, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (“[I]f sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid”); United States v. Gillenwaters, 890 F.2d 679, 681 (4th Cir.1989) (same).
In view of our holding that the officers had probable cause to justify a warrant for 407-A North Cedar Street, it follows that they also had probable cause to obtain a warrant to search 1309 South Pearson Street, as the evidence in support of probable cause for both locations was substantially the same. The officers had information that Moses lived and/or sold drugs at the houses; that Moses drove a green Lincoln with temporary tags to both locations; that Moses possessed drugs; that Moses possessed keys that gave him access to both residences, and they had the evidence discovered from the exigent entry *272 into 407-A North Cedar Street. In addition to that common evidence, the officers also had evidence particular to the Pearson Street residence, namely a CrimeStoppers tip that someone was selling drugs at the 1309 South Pearson Street residence, the officers’ observation of Moses’ green Lincoln at that location, and information from an informant (Graham, but his name was not disclosed in the warrant application) that Moses sold drugs from a house on Pearson Street. We therefore have little difficulty in concluding that the,evidence remaining in the application for the warrant to search 1309 South Pearson Street supported a finding of probable cause. Indeed, at oral argument, Moses conceded that the second search would stand or fall with the first.
Moses also attacks the district court’s emphasis with respect to the Pearson Street evidence that a key in Moses’ possession opened the lock on the door. He contends that the district court was not entitled to rely on that evidence because the use of the key was part of the illegal entry into the residence. As he argues, the use of the key was not “the conclusion of a discrete] investigative step to determine nothing more than whether the key operated a particular lock,” but rather “the beginning of [an illegal] search.” He argues therefore that the information gained from inserting the key into the lock should also have been stripped from the warrant application and that without that evidence, probable cause was lacking.
While the acts of inserting the key into the lock and entering the house were part of a continuous activity, the information obtained from inserting the key into the lock was nonetheless discrete from the information obtained from the illegal entry because the use of the key in the lock need not have led to entry of the residence at all. The officers could simply have tried the key and then left to obtain a warrant. If they improperly entered the residence (which the district court found they did), anything gleaned from the entry would obviously have to be excluded from the probable cause analysis (which it was). But the discrete act of inserting the key into the lock and discovering whether or not it fit did not offend the Fourth Amendment. See United States v. Salgado, 250 F.3d 438, 456 (6th Cir.2001); United States v. Concepcion, 942 F.2d 1170, 1172-73 (7th Cir.1991); United States v. Lyons, 898 F.2d 210, 212-13 (1st Cir.1990); cf. United States v. $109,179 in U.S. Currency, 228 F.3d 1080, 1087 (9th Cir.2000) (“[T]o the extent that [our earlier case] held that the insertion of the key into the lock was the beginning of a search, it is inapplicable here since there was no search that followed” (emphasis omitted)). Thus, regardless of the fact that use of the key facilitated the warrantless entry, the officer’s insertion of the key into the lock served the discrete investigative purpose of confirming that Moses had access to the South Pearson Street residence.
For the foregoing reasons, the judgment of the district court is

AFFIRMED.