PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MILLIE CLOANINGER, Administratrix
of the Estate of Ralph H.
Cloaninger,

*Plaintiff-Appellant,*

v.

JOHN T. MCDEVITT, In his official
capacity as Sheriff of Burke
County, North Carolina; YONGLA
LO, a/k/a Joe Lo, Individually and
in his official capacity as Deputy
Sheriff of Burke County, North
Carolina; STEVEN PARLIER,
Individually and in his official
capacity as Deputy Sheriff of
Burke County, North Carolina;
LIBERTY MUTUAL INSURANCE
COMPANY, as surety,

*Defendants-Appellees.*

No. 07-2054

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Dennis L. Howell, Magistrate Judge.
(1:06-cv-00135-DLH)

Argued: December 3, 2008

Decided: February 9, 2009

Before WILKINSON, DUNCAN, and AGEE,
Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Duncan concurred.

---

## COUNSEL

**ARGUED:** Marc S. Gentile, KLEIN & FREEMAN, P.L.L.C., Charlotte, North Carolina, for Appellant. Sean Francis Perrin, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Appellees. **ON BRIEF:** Paul I. Klein, KLEIN & FREEMAN, P.L.L.C., Charlotte, North Carolina, for Appellant.

---

## OPINION

AGEE, Circuit Judge:

Ralph H. Cloaninger ("Cloaninger") brought this appeal from a magistrate judge's award of summary judgment in favor of the defendants to an action in which he alleged violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 and presented several state tort claims.[1] Because there is no genuine dispute of fact material to the defendants' qualified immunity to suit under § 1983 and because Cloaninger's state law claims have abated, are abandoned, or fail as a matter of law, we affirm the judgment of the magistrate judge.

---

[1]Cloaninger died on February 8, 2008, after filing his opening brief and while this appeal was pending. Following her appointment as administratrix of Cloaninger's estate, his widow (the "Administratrix"), filed a Motion to Substitute Parties seeking leave to pursue this appeal on his behalf, which the Court granted. *Cloaninger v. McDevitt*, No. 07-2054 (4th Cir. May 7, 2008). We attribute all arguments to Cloaninger except where specifically made by the Administratrix.

## I.

This case arises from events that began on March 9, 2005, at Cloaninger's home in Morganton, North Carolina. The participants offer varying versions of those events, but the material facts are uncontroverted. Around 10:00 that morning, Cloaninger began trembling and feeling nauseous and flighty, which he attributed to an adverse reaction to his prescription medication. Cloaninger attempted to contact his doctor at the Veterans Administration ("VA") hospital in Asheville but was unable to reach him. Instead, Cloaninger described his symptoms to an unidentified female at the hospital, who said she would call back soon. While waiting for the return call, Cloaninger drank several ounces of bourbon. The woman called back after about twenty minutes and told Cloaninger that she was sending help to take him to nearby Grace Hospital until he was stabilized, and that he would then be transferred to the VA hospital.

A police dispatcher subsequently contacted Burke County Deputies Steven Parlier and Yongla "Joe" Lo to report that Cloaninger had threatened suicide and to request that they conduct a welfare check at Cloaninger's house.[2] When Parlier arrived on the scene Cloaninger asked him, through the partially open doorway, whether he was taking Cloaninger to the VA hospital. When Parlier answered that he was only check-

---

[2]The deposition testimony and police reports indicate that a doctor from the VA hospital called 911 and told the dispatcher that Cloaninger had threatened suicide. Cloaninger denies that he threatened suicide but he does not dispute that the dispatcher received the 911 call, that the call indicated that Cloaninger had made such a threat, or that the dispatcher relayed the information to Parlier and Lo.

On appeal, Cloaninger asserts that the content of the call was inadmissible hearsay. However, there is no record of any hearsay objection in the record. In any event, the content was offered to explain the subsequent conduct of the officers rather than to prove the matter asserted. Accordingly, the content is not hearsay. Fed. R. Evid. 801(c); *see*, *e.g.*, *United States v. Jenkins*, 579 F.2d 840, 842 (4th Cir. 1978).

ing to see whether Cloaninger was all right, Cloaninger demanded Parlier get off his property and closed the door.

Lo then arrived and told Parlier that Cloaninger had made previous suicide threats and that when other officers had responded to those threats firearms had been found in the residence. Although Cloaninger claims that he voluntarily surrendered all of his firearms in 2004 and denies that he possessed firearms on the date in question, he does not contradict the information Lo conveyed to Parlier.[3]

When Parlier and Lo failed to make progress communicating with Cloaninger, Parlier called their supervisor, Sergeant Craig Treadway, for additional assistance.[4] When Treadway arrived, he attempted to communicate with Cloaninger both through the doorway and by telephone. According to the officers, Cloaninger again demanded to be taken to the VA hospital and, when they again refused, he ordered them off his property or else he would kill them all and then kill himself. Cloaninger denies the threats.

After his attempts to communicate with Cloaninger failed, Treadway contacted the VA hospital but was unable to reach Cloaninger's doctor or the doctor who placed the 911 call. A nurse told Treadway that she was familiar with Cloaninger and that he had a history of calling the hospital and threatening suicide. Treadway discussed obtaining an emergency commitment order and the nurse agreed with Treadway's suggestion. Because Treadway felt the circumstances were too volatile for any of the officers to leave the scene to obtain the order, he called the Burke County magistrate and conveyed the information from the VA hospital nurse with the officers'

---

[3]The officers also claim Cloaninger made threatening and racial remarks to Lo based on Cloaninger's inaccurate assumption that Lo was Vietnamese. Cloaninger admits accusing Lo of being North Vietnamese but denies making threats.

[4]Treadway is not a party to this action.

observations on the scene. The magistrate agreed that an emergency commitment was appropriate.[5]

Soon thereafter, Cloaninger opened the front door a few inches and stuck his arm through the opening, at which point Treadway grabbed the arm and tried to pull Cloaninger out. Trying to escape Treadway's grip and shut the door, Cloaninger pulled his own arm back inside, which had the effect of pulling Treadway partially through the doorway. Parlier then helped Treadway push the door open and pull Cloaninger out of the house. The three officers wrestled Cloaninger to the ground and cuffed his hands behind him. At some point during this process, Cloaninger's right arm broke and he passed out.

Cloaninger was taken to the magistrate's office, where Parlier and Treadway obtained an emergency commitment order. They then took Cloaninger to the Grace Hospital emergency room. The examining doctor was unable to detect the arm fracture and, determining that Cloaninger was too intoxicated for psychological examination,[6] refused to order his involuntary commitment. Cloaninger was then taken to the county jail to sober up overnight.

The next day, March 10, officers brought Cloaninger back to Grace Hospital where an x-ray confirmed that his arm was broken. Cloaninger was treated and released from custody. However, Cloaninger was charged with resisting arrest and communicating threats.[7] The resisting arrest charge was subsequently dismissed but Cloaninger was convicted of communicating threats.

---

[5]As with the original 911 call, Cloaninger asserts on appeal that the contents of Treadway's call to the VA nurse and the magistrate are inadmissible hearsay. As noted above, this assertion is without merit.

[6]The hospital determined that Cloaninger had a blood-alcohol content of 0.298 at the time of his examination.

[7]The communicating threats charge related to Cloaninger's behavior after he was taken into custody, not when he was seized at his home.

Cloaninger filed a complaint under 42 U.S.C. § 1983 against Parlier and Lo both individually and in their official capacities as Burke County deputy sheriffs, alleging they had violated his search and seizure rights under the Fourth and Fourteenth Amendments and his due process and equal protection rights under the Fourteenth Amendment, specifically claiming unlawful arrest, unlawful search, use of excessive force, and indifference to medical needs. The complaint also presented claims under state law for false arrest, false imprisonment, assault and battery, and malicious prosecution of the resisting arrest charge. In addition, Cloaninger included state claims of negligent hiring, negligent supervision, and punitive damages against John McDevitt in his official capacity as sheriff of Burke County, and joined Liberty Mutual Insurance Company as surety.[8] The case was referred to the United States Magistrate Judge under 28 U.S.C. § 636(c)(1).

The defendants moved for summary judgment arguing, *inter alia*, that they had qualified immunity from suit. The magistrate judge granted the motion and dismissed the case, holding that the search and seizure was justified by exigent circumstances; that the force used to effect arrest was not unreasonable; that overnight detention after medical personnel failed to detect the arm fracture did not offend due process; that the officers had probable cause for arrest justifying the seizure, detention, and prosecution; that the reasonableness of the force used during the arrest precluded the assault and battery claim; that no evidence substantiated a claim of negligent hiring or supervision; and that punitive damages are not a cause of action. In addition, the magistrate judge found the defendants "entitled to the fullest protections of qualified immunity." (J.A. 321.) Cloaninger timely appeals the judg-

---

[8]The Administratrix declares in the Motion to Substitute Parties that, as a matter of state law, Cloaninger's death abates the federal claim of unlawful seizure and the state claims of false arrest and false imprisonment. In addition, Cloaninger expressly abandons in his opening brief the negligent hiring claim.

ment of the magistrate judge under 28 U.S.C. § 636(c)(3) and we have jurisdiction under 28 U.S.C. § 1291.

## II.

The magistrate judge awarded summary judgment under Rule 56 by finding that the undisputed facts precluded Cloaninger's recovery under any of the causes of action he pled. Alternatively, the magistrate judge concluded that the defendants were entitled to qualified immunity against all federal claims. Cloaninger argues on appeal that the magistrate judge incorrectly applied Rule 56 by awarding summary judgment in the face of genuinely disputed material facts. Contending the magistrate judge erroneously relied on the defendants' version of the facts, Cloaninger also challenges the magistrate judge's finding of qualified immunity. We review an award of summary judgment de novo. *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003).

### A.    Federal Claims Under § 1983

Qualified immunity, when found to apply, bars § 1983 suits against government officers in their individual capacity. *Brandon v. Holt*, 469 U.S. 464, 472-73 & 473 n.24 (1985); *Owen v. City of Independence*, 445 U.S. 622, 638 & n.18 (1980). Qualified immunity provides "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *accord Pearson v. Callahan*, No. 07-751, slip op. at 6 (Jan. 21, 2009). Because the doctrine seeks to protect government officials from the burdens of trial and preparing for trial, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading

qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell*, 472 U.S. at 526.

Relying on the Supreme Court's instruction in *Saucier v. Katz*, 533 U.S. 194 (2001), we have recognized that the resolution of a qualified immunity defense is a two-pronged inquiry:

> First, we must decide whether a constitutional right would have been violated on the facts alleged. Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right.

*Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (internal quotation marks and citations omitted).[9] However, that a constitutional right is "clearly established" means more than that it is well-known or easily articulated.

> Rather, . . . the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

---

[9]We note that the Supreme Court has now clarified that these two steps need not be taken in the sequence set forth in *Saucier*, and that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, slip op. at 10.

> [T]o deny summary judgment any time a material issue of fact remains . . . could undermine the goal of qualified immunity to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.

*Saucier*, 533 U.S. at 202 (internal quotation marks and citations omitted).

Ordinarily, no factual findings are necessary to the analysis of a qualified immunity claim because the "issue is a purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law." *Mitchell*, 472 U.S. at 528 n.9; *accord Elder v. Holloway*, 510 U.S. 510, 516 (1994). However, the defendants may still contest on a motion for summary judgment the adequacy of the plaintiff's evidence to support the allegations in his complaint. "Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." *Mitchell*, 472 U.S. at 526.

The procedural framework for evaluating a claim of qualified immunity is therefore clear: when the defendant in a § 1983 action raises a qualified immunity defense, the court ordinarily assesses whether the plaintiff's complaint states sufficient factual allegations that, if true, show a violation of clearly established constitutional rights. To do so, the plaintiff's complaint must allege conduct a reasonable officer would know to be unlawful. However, when there has been discovery and the defendants challenge through a motion for summary judgment the sufficiency of the plaintiff's evidence to support the allegations of his complaint, including his

description of their conduct, an evaluation of the complaint's sufficiency is unnecessary and may unduly prolong the defendants' entanglement in litigation if the court can determine that the plaintiff's evidence does not support his allegations. In that circumstance, the familiar standard for summary judgment under Rule 56 applies.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where a case is "decided on summary judgment, there have not yet been factual findings by a judge or jury, and [the appellant's] version of events . . . differs substantially from [the appellee's,] . . . courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the . . . motion." *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (internal quotation marks and alterations omitted).

However, "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Id.* at 1176 (quoting Fed. R. Civ. P. 56(c)). Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In the case before us, the defendants presented both the legal claim of qualified immunity and an evidentiary challenge to Cloaninger's allegations in the same motion for summary judgment.[10] Despite Cloaninger's contention to the

---

[10]The burden of pleading qualified immunity lies on the defendants. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991). The defendants first presented

contrary, there is no genuine dispute concerning the material facts—the officers' conduct—because we are able to establish the relevant conduct from the uncontroverted facts.

Cloaninger had taken prescription medication, an adverse reaction to that medication made him feel "flighty," and Cloaninger compounded the effects of the medication by drinking alcohol. He called the VA hospital and, regardless of what he may have communicated in that call, it led a VA doctor to call 911 and request police assistance for a suicide threat. In response, Parlier and Lo were dispatched to Cloaninger's residence under the belief that Cloaninger had threatened suicide. Based on information from fellow officers, Lo knew Cloaninger had previously made suicide threats and believed Cloaninger had firearms in the house.

Whether Cloaninger was in fact abusive and threatened the officers, as they allege and he denies, is not material. Even if he was not belligerent, he admits that he was not responsive to their concerns for his well-being. Prompted by Parlier and Lo's request for assistance, Treadway joined them and attempted to communicate with Cloaninger, both through the doorway and by telephone. When those attempts failed, Treadway contacted the VA hospital and a nurse informed him that she knew Cloaninger and confirmed that he had a history of threatening suicide. Treadway and the nurse discussed emergency commitment and the nurse agreed that such a measure would be appropriate. Treadway then contacted the Burke County magistrate, who agreed to enter an emergency

---

qualified immunity in their answer and again in their motion for summary judgment, but did not invoke the doctrine in either of their earlier motions to dismiss under Rule 12(b)(6). Though the delay did not waive their claim to immunity, *see id.* (allowing invocation of qualified immunity on summary judgment); *Gomez v. Toledo*, 446 U.S. 635, 641 & 641 n.8 (1980) (suggesting qualified immunity is best raised in the defendant's answer), it did postpone the magistrate judge's evaluation of the issue until after discovery.

commitment order. The officers physically seized Cloaninger only after collecting all this information and professional advice.

They then obtained the emergency commitment order from the magistrate and transported Cloaninger to Grace Hospital for medical evaluation. The physician who examined Cloaninger did not detect the broken arm. When he learned from the hospital's tests that Cloaninger's blood-alcohol content was 0.289, the physician decided Cloaninger was too drunk to complete a psychological evaluation and the officers then took Cloaninger to jail until he sobered up. The following day, they took him back to the hospital, where the extent of his injury was determined and where he received the necessary treatment.

The officers' conduct is thus established beyond genuine dispute. The only remaining question is whether that conduct was objectively reasonable, which is a question of law, not fact. *See Willingham v. Crooke*, 412 F.3d 553, 559-60 (4th Cir. 2005).

Relying on *Bailey*, Cloaninger argues that the defendants' conduct was not reasonable because they lacked probable cause to seize him. In *Bailey*, we determined that a neighbor's 911 call reporting that the plaintiff threatened to kill himself was insufficient, "without more," to establish probable cause for police to seize him for a psychological evaluation. 349 F.3d at 740. Cloaninger contends that the VA doctor's call reporting the suicide threat is therefore insufficient to create probable cause for the defendants' actions.

The defendants counter that the facts of this case are more analogous to *Gooden v. Howard County*, 954 F.2d 960 (4th Cir. 1992). There, officers responded to two 911 calls, about one week apart, from a resident in an apartment complex reporting screams in the apartment overhead. On the second instance the responding officers themselves heard the

screams, accompanied by loud banging noises, but the plaintiff, who was alone in the apartment, denied making them and other residents of the apartment complex disagreed about their source. *Id.* at 962-64. We held that the officers acted reasonably in seizing the plaintiff for psychological evaluation because they had received both repeated citizen complaints about violent screams and verified through multiple personal observations that the screams appeared to come from the vicinity of the plaintiff's apartment. *Id.* at 965-66. The defendants contend that Cloaninger's threats to kill them and belligerent behavior similarly created exigent circumstances justifying their conduct.

We believe neither of these arguments resolves the matter. We cannot rely on the officers' characterization of Cloaninger's behavior because he denies it. On summary judgment we must take the facts in the light most favorable to him. Consequently, for the purpose of our analysis, we must assume Cloaninger was not belligerent and did not threaten the officers. However, we cannot ignore the undisputed evidence that these defendants had much more information available to them than the mere 911 call in *Bailey*. We believe that additional information known to the officers in this case establishes probable cause for them to seize Cloaninger. Indeed, as in *Gooden*, had "the officers done nothing"—and had Cloaninger hurt himself or someone on the premises—"the consequences may have been irremediable." *Cf.* 954 F.2d at 967.

In the criminal arrest context, probable cause exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). While both *Gooden*, 954 F.2d at 968, and *Bailey*, 349 F.3d at 739, found a "lack of clarity" in the law concerning the existence of probable cause to justify a seizure for psychological evaluation, we

believe officers have probable cause to seize a person for a psychological evaluation when "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man" to believe that the person poses a danger to himself or others. *Cf. Beck*, 379 U.S. at 91. This dual concern was evident in *Gooden*, where we stated that "the reasonableness of [the officers'] response must be gauged against the reasonableness of their perceptions"—in that case, of a "genuine danger" not only to the residents of the apartment complex but to the plaintiff herself. 954 F.2d at 965-66.

Lo knew that Cloaninger had made prior suicide threats, that police had responded to those threats, and that firearms had been found in the home. Treadway called the VA hospital, where a nurse who knew Cloaninger confirmed that he had made prior suicide threats. Treadway had no reason to doubt the objectivity of the nurse or the veracity of her information. Both the VA nurse and the Burke County magistrate agreed that an emergency commitment was an appropriate action. On these undisputed facts, we hold that the defendants had probable cause to seize Cloaninger and detain him for the purposes of a psychological evaluation. But this does not end our inquiry into the reasonableness of their conduct.

While probable cause is sufficient to effect a seizure, the unique qualities of the home prohibit seizures there without a warrant or exigent circumstances. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). Exigent circumstances exist when there is "a risk of danger to the police or to other persons inside or outside the dwelling . . . ." *United States v. Moses*, 540 F.3d 263, 270 (4th Cir. 2008) (internal quotation marks omitted).

Regardless of Cloaninger's disputed behavior, the initial VA call, coupled with knowledge of Cloaninger's prior sui-

cide threats and the belief that he possessed firearms, established to an objectively reasonable police officer that Cloaninger was a danger to himself. Moreover, Treadway concluded that the situation at the house was too unstable for any of the three officers there to leave the premises to obtain the emergency commitment order. Accordingly, the circumstances facing the defendants were exigent and we hold that the undisputed facts in this case establish that the officers' conduct was objectively reasonable.

Because Cloaninger's evidence on summary judgment fails to establish any objectively unreasonable conduct, he cannot prove that the defendants violated a clearly established constitutional right. Thus, qualified immunity bars Cloaninger's suit against Parlier and Lo individually and summary judgment was properly awarded.[11]

## B. Claims Under State Law

Qualified immunity against state law claims under North Carolina law requires a substantively different analysis from qualified immunity against a claim brought under 42 U.S.C. § 1983 alleging the violation of a federal right. *Andrews v. Crump*, 547 S.E.2d 117, 123 (N.C. Ct. App. 2001). Accordingly, we evaluate Cloaninger's remaining state law claims separately under applicable North Carolina law. The state law claims presented in the complaint are false arrest, false imprisonment, assault and battery, malicious prosecution, negligent hiring, negligent supervision, and punitive damages.

---

[11]Qualified immunity does not bar § 1983 actions brought against defendants in their official capacity. *Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 307 n.13 (4th Cir. 2006). Although Cloaninger's complaint names Parlier and Lo defendants both individually and in their official capacity, his federal claims against them in their official capacity must also fail because the complaint does not allege that they acted pursuant to a regulation, policy, or practice authorizing unconstitutional action against him. *Jackson v. Long*, 102 F.3d 722, 731 (4th Cir. 1996).

For the reasons that follow, the Administratrix cannot prevail on any of these claims because they are either abated, abandoned, or fail as a matter of law.

### 1.   Abated Claims

Based on the concession in the Administratix' Motion to Substitute Parties, we disregard Cloaninger's state law claims of false arrest and false imprisonment because these claims have been abated by his death. In addition, Cloaninger inextricably linked his assault and battery claim to his abated claim of false imprisonment. In his response to the defendants' motion for summary judgment, Cloaninger declared that, under North Carolina law, "[w]ith every false imprisonment allegation, there is necessarily an allegation of assault." (J.A. 111.) Cloaninger renews this association on appeal by asserting that the magistrate judge erred in finding no genuine issue of material fact as to assault and battery because, he contends, the issue of whether Parlier and Lo falsely imprisoned him remains in dispute. (Br. Appellant 25.)

Cloaninger has correctly stated North Carolina law. In *Hoffman v. Clinic Hosp., Inc.*, 197 S.E. 161 (N.C. 1938) (per curiam), the Supreme Court of North Carolina held that "[f]alse imprisonment is the illegal restraint of one's person against his will. It generally includes an assault and battery, and always, at least, a technical assault." *Id.* at 162. However, because Cloaninger presents his assault and battery claim as nothing more than the necessary implication, under state law, of his false imprisonment claim, we consider it to be included in the false imprisonment claim abated by his death.

### 2.   Abandoned Claims

Cloaninger expressly abandoned his negligent supervision claim, and we consider his malicious prosecution claim abandoned as well.

Under North Carolina law, "[a] plaintiff must prove four essential elements to establish a malicious prosecution claim[:] (1) that defendant initiated the earlier proceeding, (2) that he did so maliciously and (3) without probable cause, and (4) that the earlier proceeding terminated in plaintiff's favor." *Jones v. Gwynne*, 323 S.E.2d 9, 11 (N.C. 1984) (internal quotation marks omitted). However, Cloaninger directed his claim of malicious prosecution against different proceedings at different times. In his complaint, he clearly directs the claim to the resisting arrest charge, which was ultimately dismissed:

> 53. Following the improper arrest of the Plaintiff . . . he was charged with, *inter alia*, resisting arrest.
>
> . . . .
>
> 55. At the time said charges were made, [the] Defendants knew, or should have known, that there had been no lawful arrest of the Plaintiff, or any illegal resistance thereof.
>
> 56. During the trial based on the false arrest warrant, the charge of resisting arrest was dismissed.

(J.A. 18.)

At no point in his complaint does Cloaninger direct the malicious prosecution claim to his involuntary commitment. However, for the first time in his response to the defendants' motion for summary judgment, Cloaninger asserts that the malicious prosecution claim is based on Parlier and Lo's failed attempt to have him involuntarily committed: "[T]he Defendants lacked probable cause to arrest [Cloaninger] as a candidate for an Involuntary Commitment. . . . There is no question that the Involuntary Commitment proceeding failed." (J.A. 112.) It is this second position that Cloaninger maintains on appeal by contending that the magistrate judge "considered

this claim in light of the Communicating Threats and Resisting Arrest charges against [Cloaninger], rather than in light of the Involuntary Commitment Order. However, the Response [to the defendants' motion for summary judgment] makes clear that this claim relates to the involuntary commitment proceeding." (Br. Appellant 25) (citations omitted).

Cloaninger's current malicious prosecution claim is therefore not the one presented in his complaint. We have previously held, along with the Fifth, Sixth, Seventh, and Eleventh Circuits, that a plaintiff may not raise new claims after discovery has begun without amending his complaint. *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 Fed. Appx. 556, 563 (4th Cir. 2008) (unpublished) (citing *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); and *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)). Therefore, we will not consider Cloaninger's claim of malicious prosecution based on the involuntary commitment proceeding. In addition, because Cloaninger did not argue his claim of malicious prosecution based on the resisting arrest charge below or on appeal, it is abandoned. *See 11126 Baltimore Boulevard, Inc. v. Prince George's County*, 58 F.3d 988, 993 n.7 (4th Cir. 1995) (en banc) (issue waived when not argued on appeal).

### 3.   Claims Failing as a Matter of Law

Both the punitive damages and negligent supervision claims fail as a matter of state law. Punitive damages are not a cause of action, *Hawkins v. Hawkins*, 400 S.E.2d 472, 474 (N.C. Ct. App. 1991), and Cloaninger has not presented facts sufficient to support each of the elements necessary to establish negligent supervision.

To prevail on a claim for negligent supervision in North Carolina, a plaintiff must prove:

(1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the [employer] of such unfitness or bad habits, or constructive notice, by showing that the [employer] could have known the facts had he used ordinary care in oversight and supervision, . . .; and (4) that the injury complained of resulted from the incompetency proved.

*Medlin v. Bass*, 398 S.E.2d 460, 462 (N.C. 1990) (quoting *Walters v. Lumber Co.,* 80 S.E. 49, 51 (N.C. 1913)) (internal quotation marks and emphasis omitted)). In order to prove the third element, notice, "the plaintiff must prove . . . that prior to the [employee's tortious] act, the employer knew or had reason to know of the employee's incompetency." *Barker v. Kimberly-Clark Corp.*, 524 S.E.2d 821, 827 (N.C. Ct. App. 2000) (internal quotation marks omitted).

Cloaninger does not allege any basis upon which McDevitt would know or have reason to know Parlier and Lo were incompetent because the only acts of Parlier and Lo alleged in the complaint are those which occurred on March 9 and 10, 2005. McDevitt, as the employer, obviously could not have prior notice of his employees' incompetence on the basis of a present act, even if that act is incompetent as alleged. Accordingly, Cloaninger has failed to allege or present any evidence which could establish the required element of notice for a claim of negligent supervision. His claim therefore fails as a matter of law.

In summary, all of Cloaninger's state law claims fail either because they have abated, are abandoned, or cannot be sustained as a matter of law.

## III.

For the foregoing reasons, we therefore affirm the judgment of the magistrate judge.

*AFFIRMED*