PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

STEVE MAURICE COLEMAN,

*Defendant-Appellee.*

No. 08-5038

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(3:08-cr-00478-MJP-1)

Argued: October 15, 2009

Decided: December 4, 2009

Before TRAXLER, Chief Judge, WILKINSON,
Circuit Judge, and HAMILTON, Senior Circuit Judge.

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Traxler and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED**: Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. David Truitt, SALLEY LAW FIRM, Lexington, South

Carolina, for Appellee. **ON BRIEF:** W. Walter Wilkins, III, United States Attorney, Robert C. Jendron, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellant.

## OPINION

WILKINSON, Circuit Judge:

This case involves the consensual search of a bedroom by police and the seizure of a pistol resulting from the search. As explained below, we reverse the district court's grant of the motion to suppress the pistol. The district court viewed the evidence through the lens of its later significance, but we hold that the officers acted reasonably in seizing it based on what they knew at the time.

### I.

Steve Coleman, a convicted felon, lived with his girlfriend, Amy Broome, in her Batesburg, South Carolina home. Around 10:00 p.m., on September 21, 2006, two men broke into Broome's garage, and hid there while Coleman was at a store with a friend. Upon Coleman's return, he asked Broome to open the garage for him. When Broome reached into the garage to push the opener button, she was attacked and forced back into the house by the two men. Coleman entered the garage through the opened door and saw Broome in the house struggling with the men. One of the men was pointing a gun at Broome's face. Coleman entered the home, pulled the assailants from Broome, and ordered her to run outside. Broome ran out to Coleman's friend and called 911.

Meanwhile, Coleman started to leave the kitchen to check on Broome's sleeping son but was shot in the chest and hand by one of the intruders. His assailants then fled through the

front door and to this day have not been apprehended. Bleeding, Coleman repaired to the master bedroom and retrieved a 9mm pistol from a night stand. In doing so, he left blood from his wounds around the bedroom. Coleman took the gun and went to the garage to make sure the intruders were gone. Broome and Coleman's friend entered the house, and Coleman gave Broome the gun and told her to "put it up." Broome hid the gun under the mattress in the bedroom.

Because Broome's home was some distance from a hospital, Coleman's brother was called, and he took Coleman to meet an ambulance. The Batesville police were the first to arrive after Coleman left. Broome told them about the break-in and Coleman's shooting. Lexington County Sheriff officers from the Major Crimes Unit arrived next. They asked Broome to sign a consent form to allow them to search the house for evidence, which she did. Broome then spoke to Detective Michelle Horton and gave a statement but omitted any mention of Coleman's firearm.

The consent form gave officers the right "to conduct a complete search of the premises and the property, including all buildings and vehicles, both inside and outside." Additionally, it granted the officers "permission to take from my premises and property, any letters, papers, materials or any other property or things which they desire as evidence for criminal prosecution in the case or cases under investigation." Broome later testified that she did not verbally limit the police officers' search in any way. In fact, she gave them permission to search "anywhere in the house." Similarly, she testified that she did not verbally limit the search to any particular officers.

Sergeant Oscar McIntosh, the supervisor on the scene, and Detective Laura Grimes-Gould, the crime scene investigator, entered Broome's home pursuant to the consent form. Sergeant McIntosh testified that they found a large pool of blood on the kitchen floor, with trails of blood leading from there through the living room and out the front door, through the

mud room and into the garage, and into the master bedroom. McIntosh did not know at the time whose blood was on the floor. The officers knew that Coleman had been taken to the hospital with gunshot wounds, but McIntosh testified that there also was a suggestion that an intruder may have been shot.

McIntosh and Grimes-Gould followed the blood trail into the master bedroom. The blood went around the bed and was also on the bedspread. From the location of the blood on and around the bed, McIntosh believed that "someone . . . put something under there." Detective Grimes-Gould lifted the mattress and found the gun hidden beneath it.

The next day, September 22, 2006, officers from the Lexington County Sheriff's Department interviewed Coleman and Broome. Both admitted that Coleman grabbed the gun during the course of the home invasion.

Coleman was indicted by a grand jury on May 22, 2008 for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Because of his prior convictions, the charge carried a mandatory minimum of fifteen years' imprisonment. Coleman filed a motion to suppress all evidence found in the search of his residence, which the district court granted after an evidentiary hearing.

The district court emphasized that the gun turned out not to have been used by the home invaders and that police came to realize it was not evidence in the shooting of Coleman. Further, the court believed there was no reason for the police to search the master bedroom and that the search exceeded the scope of Broome's consent. The district court also suppressed Coleman and Broome's statements to police the day after the incident as fruits of the purportedly unlawful search and seizure. This appeal followed.

II.

In evaluating an appeal from a suppression order, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *U.S. v. Moses*, 540 F.3d 263, 268 (4th Cir. 2008); *U.S. v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007).

A.

Coleman first claims that the search of the master bedroom was beyond the scope of the consent Broome gave to police. He asserts that Broome only "authorized the police to search the entire premises for any items relating to the crime against Broome and Appellee that had recently occurred" and that the search of the master bedroom was not related to that crime. Br. of Appellee 10.

As courts have long recognized, "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. U.S.*, 389 U.S. 347, 360 (1967)). Searches pursuant to consent are allowed because "it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Id.* at 250-51 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

Of course, it would be patently unreasonable for police to proceed to search a home pursuant to an involuntary consent. But Coleman does not challenge the voluntariness of Broome's consent, nor could he. Viewed under the totality of the circumstances, as required by *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), Broome's consent was voluntary. In fact, it was in her interest to have officers search her house for evidence that might lead to the apprehension of the men who assaulted her and shot her boyfriend. In addition, the consent form Broome signed stated, "Knowing of my lawful right to refuse to consent to such a search, I willingly give my permission." Such written consent to a search "supports a

finding that the consent was voluntary." *See United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001), and there is nothing to suggest that any coercive tactics were employed here.

Where there is no question that consent was voluntary, the real issue becomes the scope of the authorization given to the officers. The Supreme Court has noted that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251 (citing cases); *see also U.S. v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005).

In addition, contrary to the district court's view, determinations about the objective reasonableness of a search are made as of the time when the search takes place, based on the information available to officers *at that time*. *U.S. v. Di Re*, 332 U.S. 581, 595 (1948); *cf. U.S. v. McCraw*, 920 F.2d 224, 227 (4th Cir. 1990) (probable cause for arrest evaluated based on facts and circumstances known at the time). Just as facts uncovered at a later date cannot justify an unreasonable search, so also they cannot undermine a reasonable one. *Di Re*, 332 U.S. at 595; *Michigan v. DeFillippo*, 443 U.S. 31 (1979) (search incident to arrest not invalid even though law violated by arrestee was later held unconstitutional).

B.

Here, the officers reasonably interpreted the scope of Broome's consent to search. Most importantly, the language of the consent form is quite broad, belying Coleman's claim that the search exceeded the scope authorized. The document Broome signed gave permission "to conduct a *complete search* of the premises and the property, including all buildings and vehicles, both inside and outside." (emphasis added). Broome also testified at the suppression hearing that she gave officers permission to search "anywhere in the house" and did

not verbally restrict the search in any way. Given the breadth of this authorization, it is difficult to say that the police were anything but reasonable.

"The scope of a warrantless, but consensual, search is generally defined by its expressed object," *U.S. v. Marshall*, 348 F.3d 281, 287 (1st Cir. 2003) (citing *Jimeno*, 500 U.S. at 251). That legal limitation was satisfied here. The "expressed object" of the search in the present case was evidence relating to an assault and shooting, and blood trails that lead to firearms are obvious examples of objects that are well within the scope of a shooting investigation.

That having been said, the giver of consent, in this case Broome, controls the scope of consent. It is perfectly within a homeowner's rights to give a limited consent to search. As the Supreme Court has stated, an individual "may of course delimit as he chooses the scope of the search to which he consents." *Jimeno*, 500 U.S at 252. No such limits being imposed here, however, there is no reason why we should invent them. Again, it is not surprising that Broome gave such a broad consent. It was in her interest to allow a wide search because her home had been invaded, she had been assaulted, and her boyfriend had been shot.

Not only was the bedroom within the scope of the consent search, but the officers also would have been derelict in their duty not to follow a blood trail from the kitchen. Far from not being part of the crime scene, as Coleman argues, *see* Br. of Appellee 15, nothing less than a trail of blood led to the master bedroom from the kitchen where the shooting occurred.

Further, at the time of the search the officers had no way of knowing whose blood trail they were following. They knew that Coleman had been shot, but Sergeant McIntosh also testified that there were reports that one of the intruders may have been shot as well. At a minimum, the trail of blood was likely to lead to evidence of some kind, even if nothing more

than physical corroboration of events as told by witnesses. Furthermore, for all that the officers knew, the trail of blood could have led directly to a suspect, or it could have led to another victim in need of assistance. In short, there were any number of reasons why officers, based on what they knew, behaved reasonably by following the blood trail.

### C.

For the same reasons, it was reasonable for Detective Grimes-Gould to lift the mattress in the master bedroom where the gun was found once the officers reached the end of the blood trail. As already noted, Broome consented to a "complete search" of her home, and Sergeant McIntosh believed from the blood stains on the bed and floor that "someone . . . put something under [the mattress]." It was reasonable for officers investigating a shooting pursuant to a complete consent to look under a mattress where it appeared that a wounded individual may well have hidden something.

What exactly the mattress concealed, and what its significance might be, was at the time uncertain. Things whose significance is not clear at the outset may, in light of other evidence, be very significant indeed. Conversely, evidence that may seem significant at first may turn out not to be so. To hold that lifting this mattress was unreasonable, however, would be to halt an investigation in its tracks, indeed at the very point when an objectively reasonable officer would surmise that fruitful evidence might be forthcoming. The fact that the gun the police found in the bedroom later turned out to be unrelated to Coleman's shooting is simply irrelevant to the question of whether the officers acted reasonably at the time. Judgments are best rendered by understanding circumstances confronting actors at the time that they act, *see*, *e.g.*, *U.S. v. Buckner*, 473 F.3d 551, 555 (4th Cir. 2007); *Altman v. High Point*, 330 F.3d 194, 206-07 (4th Cir. 2003), and nothing in the Fourth Amendment departs from that sound principle.

### III.

Having established that the search was reasonable, we may readily resolve the related issues of the seizure of Coleman's gun and the suppression of Coleman and Broome's subsequent statements to police. With regard to the seizure, Broome gave officers "permission to take . . . any letters, papers, materials or any other property or things which they desire as evidence for criminal prosecution in the case or cases under investigation." Thus the issue becomes whether the officers at the time reasonably believed the evidence seized might be related to the crime. As the Supreme Court explained in *Warden v. Hayden*, police must have "cause to believe that the evidence sought will aid in a particular apprehension or conviction." 387 U.S. 294, 307 (1967).

It was entirely reasonable for the officers to believe the gun would aid in their investigation. First, they were at the scene to investigate a shooting, and pistols clearly relate to shootings. Second, it was objectively reasonable to seize a gun at the end of a blood trail. Finally, the officers had no way of knowing whether or not the pistol they found had been used to shoot Coleman, an intruder, or someone else entirely. The events of the evening were chaotic, to say the least, and it was hardly incumbent on the officers to clear up the confusion on the spot. Based on what the officers knew, the seizure of the gun was plainly reasonable.

Both the search and the seizure being reasonable, Coleman and Broome's subsequent statements are not fruit of any poisonous tree. *See Wong Sun v. U.S.*, 371 U.S. 471 (1963). No violation of the Fourth Amendment having occurred, admissions regarding Coleman's possession of the gun in response to police questioning about it should not have been suppressed.

## IV.

While we note the irony of a shooting victim being arrested while his assailants are never apprehended, that unfortunate result does not change the proper outcome. Coleman was a convicted felon and as such it was unlawful for him to "possess . . . any firearm or ammunition." 18 U.S.C. § 922(g). The fact that other serious wrongdoers remain free does not impeach the lawfulness of the officers' conduct or bear upon the resolution of Coleman's legal claims. Because the officers who searched Broome's home acted in an objectively reasonable manner, the district court's suppression ruling must be reversed, and the case remanded for further proceedings consistent with this decision.*

*REVERSED AND REMANDED*

---

*Because we hold that the search and seizure were objectively reasonable, we need not address the government's alternative claim that the seizure of the pistol was justified under the Fourth Amendment's plain view doctrine.